Good morning, Your Honors. Steve Blake on behalf of Appellant Michael Chess. I'd like to reserve three minutes for rebuttal. Your Honors, this case presents a question of whether when a prison policy directly impacts the care that an inmate is provided, whether prison medical officials are entitled to a deference instruction that instructs the jury or commands the jury to give deference to prison officials on the adoption and the execution of policies that are intended to preserve discipline and maintain internal security. There's two main points I'd like to talk with you today, the first being whether the giving of the deference instruction was an error in this context, and the second about why its use was prejudicial to the central issues of this trial. Turning to the first issue, the use of a deference instruction in an Estelle medical case conflicts with both Supreme Court precedent and this Court's own precedent. The standard for a medical care claim under the Eighth Amendment is set by Estelle v. Gamble. It applies a deliberate indifference standard to the subjective intent element. Neither Estelle nor any of the cases in his progeny speak of the need for either the court or for juries to defer to doctors in determining the subjective intent element. By contrast, in the Whitley case, the Supreme Court decided the standard in which the subjective element for the Eighth Amendment claim should apply to an excessive force came in the context of quelling a prison riot. The Court in that context noted that in a fastly moving violent situation, deference is warranted to prison officials in their attempts to preserve order and discipline and maintain institutional security. Here's my problem with this case. If this were just an ordinary medical care case, I think a deference instruction is inappropriate. I mean, you know, that's an ordinary medical care case. The guy comes in with a complaint, and the doctor kind of blows him off, and then it turns out six months later he has a condition that's no longer treatable. Deliberate indifference. I don't think we need any sort of special deference instruction. The circumstance in this case is a little trickier, though, because there's an argument that the reason they're not giving narcotic drugs, methadone for this guy, is that they've got a drug problem in the prison, and the way that the warden has decided to handle it is that the drugs will not be distributed to people in the general population. The only way you get those drugs is if you're in the clinic or you're otherwise under some form of treatment. Well, if I were the warden, maybe I'd do that, maybe I wouldn't. But that's the sort of thing that you say, well, you know, maybe I should defer to the expertise of the warden. So what do I do with this case, not your run-of-the-mill medical case, but this case? Sure you are. I think I would say three things in response to that. The first, I think, is a factual point. And on the record below, the only testimony that came in as to the purpose of this narcotics policy came from the prison medical director, Dr. Roach. And that testimony came in our excerpts of record at pages 49 and page 50. It seems to me, based on Dr. Roach's explanation, that he was not raising safety or custodial concerns in the same sense that we saw in Whitley, such as, you know, the need to apply violence to quell a prison riot, or even as we saw in the Norwood case, which was actual a need for a custodial lockdown in order to prevent attacks on prison inmates. What the doctor said here, it sounds more like an administrative concern to me. Essentially what he said was we didn't have a process in place to document the use of narcotics. And so essentially the warden decided that he was not going to allow narcotics in the yard at all. So I think that raises a question on the record of whether the government has established that there was a security need that was justifying, a security need for this policy justifying to give the instruction. But putting that aside, I think Your Honor makes a good point, which is similar to the point that the government has made, is if we're outside the ordinary and the typical case, what do we do in this context? Because clearly some form of jail security or prison security is implicated, and so how do we take that into account? Sure. I mean, I think you can say in the context of a prison that at the end of the day, almost any policy can be traced back to some kind of security concern. And so I have concerns in this context if we're saying, you know, does the, does the, does the exception essentially swallow the rule here in the absence of guidance from the Supreme Court as to whether we should provide deference? Are we going too far beyond the case law in saying, well, if there's any policy that relates to a security issue, do we have to then provide deference? The other point that I think I would raise is the government relies very heavily on the Wilson case to essentially suggest that if deference instructions are appropriate in a conditions of confinement case under Norwood, the Wilson case essentially equates conditions of confinement with medical care claims, and therefore, those claims should be both treated under application of the deference instruction. I have a little bit of a problem with reading Wilson that way, because what Wilson does is essentially draw the same distinction between applying deference in an Estelle case versus applying deference in the Whitley situation. And so using Wilson in order to import Norwood into medical care claims to some extent is counter to what Wilson says. Kagan. This is a different question, but I want to make sure I get it in before your time runs too long on you. The mode of objection or non-objection is odd here because he's representing himself. If there were a lawyer here who had failed to object to the instruction, I would treat it as plain error. But he's not a lawyer. The judge puzzles out loud as to whether or not it should be given. So the judge is clearly alerted to the problem. And the plaintiff, pro se, says, listen, Judge, I'm just going to leave it up to you. Is this plain error review or is this ordinary review? I'm kind of betwixt and between because he didn't object. He said, Judge, well, you get to do whatever you want to do. On the other hand, the judge knows exactly what the problem is. He's not being sandbagged. Yeah. I would agree with that, Your Honor. You know, the court has a long line of cases saying pro se litigants are entitled to some leniency. And the purpose of Rule 51 is that essentially the trial judge is put on notice and not just put on notice to an ethereal objection, but is put on notice to the specific cause for concern. And in this case, you have a pro se litigant who only receives the instructions at trial, has indicated that he's not prepared to debate them, has heard the judge's objection and indicates that he doesn't really understand, and essentially is giving the judge his proxy. And so the judge is essentially standing both in the shoes of the pro se litigant and in his role as a court, is making an objection and in essence overruling it. And so in that context, I think you could find that there was not a waiver. But if there is a technical waiver, I think either the plain error exception applies or the pointless formality exception applies. Because in this context, after the judge had, you know, very cogently weighed the various concerns in bringing this type of instruction and then decided ultimately to bring it, any form of objection from the plaintiff at the time would have been a pointless formality. Could I ask you at this point to shift to the prejudice prong? Because your time is running out, and that's the part of your argument that troubles me or I have the biggest problem with, I guess. Sure. Right. So the issue of prejudice, in my mind, is fairly clear if there — if the Court finds that there is an error. And in that case, prejudice is presumed and the burden shifts to the government. I think the issue of prejudice here is clear based upon the narrow issues that were supposed to be tried before the Court. There were supposed to be two issues that were tried, was, one, whether the forced withdrawal of medication that Mr. Chess was subjected to was deliberate indifference, and the second was whether in context of the prison policy prohibiting narcotic drugs, whether the anti-sterile drugs that he was administered were harmful to his liver. But, I mean, the policy didn't forbid him to receive the, let's say, methadone. He just needed to get it in the infirmary. Well, I think that's exactly — it's exactly the point, Your Honor. He was allowed to receive methadone or, as we would contend, at least be tapered off the methadone in the context of the infirmary. He was tapered off another drug. He was not tapered off methadone. And when one of the treating physicians was asked why, the physician said, I don't know. This subjected him to the nightmare withdrawal. So — Well, hold on. Hold on. Okay. The reason I raise that point is it seems to me the policy is irrelevant to what happened to your client. Well, so the instruction, Your Honor, does not just say that you're entitled to deference on the adoption of the policy. The instruction says that the doctors are also entitled to deference in the execution of the policy. And the doctors are treating their reason for taking him off the methadone as being covered under the umbrella of that policy and are essentially asking the court to instruct a judgment that their execution of that policy is entitled to deference. And in my case, it is my belief that the execution of that policy is the clearest instance of deliberate indifference that we see in this case. And so the instruction as given really impacts the central issue that was tried. I thought the doctors testified that they didn't think methadone was medically indicated. That's the basic reason why he didn't receive it, because if they had thought it was medically indicated, they would have put him in the infirmary. Am I wrong on the record on that? It was an undisputed fact that the reason he was withdrawn was because of the policy. I believe the doctors at trial testified that, based on their review of the record, they did not believe that it was medically necessary. However, that aside, that does not impact the decision on whether he should have been tapered off the drug or not. And as Mr. Chess testified, the decision to taper, or the decision not to taper, is what subjected him to several weeks of withdrawal symptoms that he classified as a nightmare, that he was in constant pain and that he was miserable. And that is the instance of deliberate indifference here. And it's the, you know, it is the overhang of the instruction that is prejudicial on that key point. I will reserve the remainder of my time for rebuttal. Okay. Thank you. Good morning. May it please the Court. Thomas Patterson on behalf of the State Medical Professionals. I do want to address both points this morning. And the first I'll address is the propriety of the instruction. And it was appropriate here for the district court to follow this Court's precedent in Norwood, that in a prison medical – I'm sorry, that in a prison conditions case under the Eighth Amendment, juries should be instructed to defer to prison officials' expertise in crafting and executing policies that implicate security concerns. But that's with respect to conditions of confinement, right, not – That is correct. Correct, Your Honor. And as Wilson v. Cedar says, U.S. Supreme Court precedent, medical deliberate indifference claims really bring up conditions. They are conditions of confinement cases. When an inmate is restricted from receiving certain treatment that he would prefer in prison, it is a condition of his confinement. He's having that restriction imposed on him because he is a prisoner. It is a condition of his confinement. But, I mean, the reason we give the deference in the straight conditions of confinement context, and I think of, you know, how much time in the exercise yard are you going to have, that kind of thing, it's because the prison has to necessarily balance in that context the needs of the prisoners versus secure internal security. And that doesn't typically come up in the medical needs context, does it? That's right, Judge Wofford. And generally, security issues do not play into medical deliberate indifference cases. And that's why the general basic deliberate indifference standard for medical cases doesn't bring into account the long-established guidance from the Supreme Court and this Court that when security policies come into play, there should be a certain degree of deference that is afforded to the prison officials in crafting that security policy. So when you have a case, a medical case, that does bring up security concerns, then in those rare instances, it is appropriate for the judge to instruct the jury to defer to the prison officials' expertise in understanding what the security threat is and understanding what appropriate options there are in dealing with that security threat. Now, I understand what you're saying, and it's obvious that we've been back and forth on precisely that point. But what I'm concerned about is that if you — if the defendant is protected both by the deliberate indifference standard, which is much higher, of course, than just malpractice, it's — and deliberately so, and on top of the deliberate indifference standard, which is quite protective of the prison, we get a deference standard on top of that. We've really piled sort of presumption upon presumption in favor of the prison. Why isn't it sufficient in a medical treatment case to say deliberate indifference is the standard, and in a case where prison security is implicated, you, the jury, get to consider the medical response in light of the security concerns that have been articulated as you decide whether there's been deliberate indifference? Why isn't that an appropriate way to go about it instead of saying both deliberate indifference and deference on top of that? Your Honor, this Court's decision in Norwood actually anticipates that precise question. And what Norwood says is that juries don't know to give deference unless they're told to give deference. So when you have a standard that already affords some leeway to the prison medical officials here, it's not enough just to rely on that standard. If the prison officials are entitled to some deference, as this Court and the Supreme Court have said, to the security concerns, then the jury ought to be instructed that it should give deference, and this isn't, you know, blind adherence or blind acceptance to whatever the prison officials say, but some deference in understanding what the security policies are and understanding what an appropriate response to those security policies is. This is a tricky one because it seems to me that the prison is entitled to have certain policies, but particularly where drugs are involved. I'm very sympathetic to the prison's asking for deference on that point. But to use that as a shield for a policy that results in sort of unnecessarily inadequate treatment, I'm nervous about this intersection. It doesn't fit very easily. Well, I think it helps, Your Honor, to look at it in this respect. Juries should give deference where deference is due. So they give deference to the prison officials in deciding, is there really a security threat here? So the precise circumstances we have in this case is that narcotic drugs were not allowed on the general population yard. And there's a good reason for that. They didn't have adequate controls to ensure that the right prisoners were getting the right medication. And so what happens is a prisoner can cheat a drug and then sell it to other inmates, and a drug trade begins, and then you can have violence and drug debts and violence because of the drug debts. So what happens here is the prison comes up with a policy that if an inmate needs a narcotic drug, we're not going to say he can't get it just because he's in prison. What we're going to say is he needs to go to the correctional treatment center to receive that drug. And the correctional treatment center is like a hospital within the prison. There are individual rooms where inmates are treated. They have round-the-clock treatment with nurses and doctors coming in and visiting all the time. Mr. Chess, in fact, here was even additionally observed by video 24 hours a day because they were taking him off of some anti-seizure medication and replacing him the prescription with other anti-seizure medication. They wanted to make sure that he was not having adverse effects because of that. So it's not that the prison just says we're not going to give this kind of treatment to prisoners because they are prisoners, but it designs specific policies to make sure that the security concerns that are at the prison are met. And that is the deference that a jury is to afford prison officials. And, again, it's not blind acceptance. If there is some evidence that there is an illegitimate purpose or that the prison officials are acting in bad faith, then the jury doesn't need to defer to that. They can go ahead and rule that the prison officials have gone too far. Kagan. So let me do a different one that's a policy. It's a case that we've already decided. It's on the books. But let's say that the prison has a policy. And it's not really security-related, but it's a policy, and the doctors are following it. The policy is if someone has severe cataracts, it is sufficient for purposes of complying with Eighth Amendment to cure the cataract in one eye so that he can walk around and see something, but to leave him blind in the other. And that's a policy. Does that get deference? No, Your Honor, because it's not based on a security policy. Like I said earlier, I don't know. So it's only security policies? Well, what about exercise in the yard? I mean, exercise in the yard, we only get two hours a day. It's not security. It's just that, you know, the yard is kind of small, and we think people are happier if, you know, there are not very many people out there. You get better exercise. It really depends on the reasons that are being presented for the policy at issue. And as this Court held in Norwood, you have to look at the prison officials' options within the constraints of the prison officials are faced with. They may have inadequate security personnel to make sure that all those inmates can go exercise on the yard safely. And remember, they're having to deal with gang issues and violent individuals to begin with, and they need to make sure that every prisoner out there is safe and not going to be subject to attack by others. So you really have to look at each instance individually, look at the constraints that the prison officials are being faced with, and judge whether they're acting deliberately indifferently. But here's my problem, and the reason I brought up the cataract and the one eye. I think we give deference, outside the medical context, to prison judgments, not merely judgments based upon the security. We give deference to all kinds of prison administrative policies unrelated to security. So I'm trying to figure out, okay, well, here's a policy that has an impact on medical care, and you say, but we don't have to give deference to that. Well, actually, Your Honor, I say that you do have to give deference in this instance because the security of the cataract case. No, no, no, I'm sorry. No, no, but I think you said that. Actually, this Court already decided that case, as I think you alluded to. I know we did. I was on the panel. Right. So in that instance, there was no security policy. It was a judgment made by the prison. But it was a policy of the prison. Right. And what I'm saying is we give deference outside the medical context to all kinds of prison policies, even prison policies unrelated to security. It's the administration of the prison. We give deference to that. How should the place be run? Right. So I'm coming back now to the cataract question. Why, in that setting, do we not give deference to that policy? Because we don't. Yeah. Even though, in other circumstances, non-security policies we give deference to. I would argue, Your Honor, that in most instances when you are actually dealing with some prison policy, it does boil down to a security issue. In that particular case, it did not. It was just a judgment made by the prison officials that, hey, if somebody's got one good eye, that's enough. And that's not something, even as this Court has said in Snow and in Hunt, you don't give deference in the general deliberate indifference cases to the defendants and whether they were acting deliberately indifferent. That's up to the judge and up to the jury to decide. But when deference is due, and this Court and the Supreme Court has been specific that deference is due in those instances when there is some type of expertise that the prison officials are exercising, and typically it does boil down to a security issue, though I concede that in some instances it may not. But when the prison officials have expertise in a particular area, that those on the outside may not fully understand because they are not intimately familiar with the how inmates tend to rehabilitate and all those types of things, that's when the judge and the jury should give some deference to the Court. I'm sorry, some deference to the prison officials. Kagan. Could you address the question asked of your adversary by Judge Watford as to prejudice? Sure. Yes, Your Honor. In this particular case, Mr. Chess was given a number of opportunities to object to the particular jury instruction at issue. And although the Court asked him repeatedly, do you object, do you object, he said no, and ultimately said that you're not talking about the objection. Let's skip past that because your time is running down. I'm talking about, okay, let's say that the instruction shouldn't have been given. Was that harmless error or harmful error here? I mean, talk about the record in this case. So it was not a harmful error here. It was, at most, harmless error. And I would actually argue, before we get to harmless error, that it was not a plain error because Mr. Chess did not object. The plain error standard applies. But regardless, this trial had two purposes. One was to decide whether the denial of the preferred pain medication pursuant to the policy violated Mr. Chess's rights, and the other was, did it interfere with his other medical conditions. And although the trial was held to address whether the denial was because of the policy and whether it harmed him, there really wasn't much that came in during the trial about the policy. In fact, Mr. Chess did not present the verdict. But that was because one of the undisputed facts that were read to the jury, right, said that he was taken off the methadone because of the policy. I can't remember the exact language. But is that correct? Yes. So the evidence actually showed that one of the doctors decided that the policy had some impact on his decision not to give Mr. Chess methadone, and that was Dr. Dial. But the thing about that is when Dr. Dial decided not to give methadone, he said that there were two reasons. One was the policy. The other was that it just was not medically indicated. And actually, Mr. Chess could have received methadone at that time because he was in the correctional treatment center, this hospital within the prison. But that's what I don't understand. So how do I even understand why this policy was even in play? It's not like it forbids it. That's what I'm saying. It's not like it said, you may not get methadone, period. It just said if you're going to get it, you've got to get it over here. So if the doctors thought he should get it, presumably, they would have put him in the infirmary or whatever you call it. That's right, Your Honor. And that's why we're arguing that there's a most harmless error, because the policy really didn't play into the doctors' and other medical professionals' decisions where it really made it. Did you request or did the defendants request the instruction? Yes, Your Honor. Why, then? And it's because at the outset of this trial, this trial was meant to address precisely that. And there was some testimony that came in during the trial that the denial of methadone was at least partly based on this policy. So the defendants then had a right to have an instruction. If the jury believed that the denial was because of the policy, then the jury should have been instructed that it was in the ---- had to give some deference to the prison officials in drafting that policy. Okay. One last question, and then we'll get to the objection question. You heard my questioning of your adversary. This is a tricky question. If this had been a lawyer representing him at trial, the lawyer not objecting to the instruction turns this into, well, it's either a waiver or it's a plain error review. On the other hand, he's not a lawyer. The judge conducting the trial knows exactly what the problem is, debates it out loud, makes up his mind, and the plaintiff says, okay, judge, I'll just leave it to you. Should we treat that as tantamount as having a ---- having had an objection? Your Honor, this Court in two unpublished decisions has said yes. It has said that ---- Maybe we should publish, then. I'm sorry? Maybe we should publish, then. Well, maybe. There are two cases. One was Night v. Prudhomme. The other one, Your Honor, Judge Fletcher should be familiar with, is Dobbin v. George Fox University. And in each of those cases, there was a pro se litigant, and the Court held that the failure to object to the instruction subjected the contended error to be subject to the plain error standard. And that means that, given the law that was before the judge at the time, did he plainly err in providing this instruction? And given Norwood in this case, it says it applies to prison conditions, given the two unpublished decisions from this Court saying that it is appropriate to give these instructions in medical care cases, the judge here did not plainly err. And you're saying in those unpublished decisions, the judge expressed an awareness of the potential problem of giving the instruction, was alerted to the legal issue that was in play, and yet we still said plain error review applied? So there isn't detailed analysis in those decisions about that. What each of the decisions said was we have this guidance from Norwood that says in prison conditions cases, this instruction should be given, and then a cite to Wilson v. Cedar, which says the Supreme Court has said that medical care cases are conditions cases, thus we should give this instruction. Thank you, Your Honor. Thank you. Your Honor, I'd like to come back to Judge Fletcher's question, is what does the Court do outside of the ordinary and typical context here? And, you know, I think in clear guidance from the Supreme Court that deference is not appropriate in medical care cases. In light of the Ninth Circuit precedent, we have to look at whether there is a grounds provided by precedent that falls somewhere between deference and no deference. And that, I think, can come from the language of Wilson, and as my colleague noted, also comes from the Court's very recent decision in Perlott. In Wilson, the Court says the subjective intent standard depends on whether the conduct can be characterized as wanton and, thus, violated subjective intent, depends on the constraints facing the individual. And Perlott has cited Wilson for this point and noted what is reasonable depends on the circumstances. And so there is a middle ground here, I think, for the Court between deference and no deference, which I think takes into account some of the concerns of the State in raising the point that, you know, this is a policy that is in place, the doctors are obligated to practice within the confines of a policy that they did not have control over. However, I think the inherent problem that we have with the deference instruction here is that the deference instruction goes beyond that. It goes beyond that to say not only are doctors being asked to or not only are jurors being asked to defer to doctors in terms of the policy itself, they are also being asked to defer to the doctors in the implementation of that policy. Essentially, they are being given a carte blanche to make decisions that, you know, in another context, in an absence of deference, may be viewed as deliberately indifferent. Thank you, Your Honor. Roberts. Kennedy. Thank you, both sides. And again, before we submit, I would very much like to thank the Simpson-Thatcher firm and, in particular, Mr. Blake for the pro bono assistance in this case. We are very appreciative of this. It doesn't mean win or lose on either this case or the last one, but I have to say that it's a very nice job and thank you.
judges: Duffy, Fletcher, Watford